**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| THE ESTATE OF JOSHUA A. McLEMORE, by and through its Administrator, Melita L. Ladner,<br><br>PLAINTIFF,<br><br>v.<br><br>JACKSON COUNTY, INDIANA; RICK MEYER, Jackson County Sheriff; CHRIS EVERHART, Jackson County Jail Commander; SCOTT FERGUSON; MILTON EDWARD RUTAN, LPN; RONALD EVERSON, MD; and ADVANCED CORRECTIONAL HEALTHCARE, INC.,<br><br>DEFENDANTS. | No.   4:23-cv-57<br><br>(DEMAND FOR JURY TRIAL) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

## I.    INTRODUCTION

1.    Joshua McLemore, a 29-year-old resident of Seymour, Indiana, died from the results of dehydration and malnutrition after spending 20 days in solitary confinement at the Jackson County Jail in the summer of 2021.

2.    Josh, who had a history of schizophrenia and substance abuse, was suffering an acute mental health crisis and receiving care at the Schneck Medical Center in Seymour when he was arrested for pulling a nurse's hair and taken to the Jackson County Jail, 10 miles away in Brownstown.

3.      Jailers immediately placed Josh in a small, windowless, padded isolation cell, where he remained confined, naked, alone, and in a constant state of psychosis for the next 20 days.

4.      The only times Josh got to leave his cell were when guards would forcibly remove him and strap him into restraint devices so they could put him under a shower and clean his cell. This was done with the direct knowledge and approval of Defendants Sheriff Rick Meyer and Jail Commander Chris Everhart.

5.      Josh's cell was constantly filthy because, due to his mental state, he would regularly spill food on the floor and tear up the styrofoam boxes and paper bags in which his meals were delivered. The food and trash were often mixed with urine or feces because Josh urinated and defecated on his floor. Although there was a bathroom attached to his cell, jail staff kept the door locked virtually the entire time Josh was there.

6.      When Josh entered the Jackson County Jail, he weighed 197.8 pounds and appeared fit and robust. However, because of his psychosis, he ate and drank very little while locked in isolation. Jail staff were aware of this from personal observations and from being able to monitor all of Josh's activities through a continuous real-time video feed. They watched as he lost almost 45 pounds in less than three weeks. But they did nothing to intervene or secure needed medical or mental health care until it was too late.

7.      By the time staff finally sent Josh to the hospital, his condition was so dire that the local hospital did not have the clinical resources to treat him and he had to be airlifted to a larger hospital in Cincinnati, where he died two days later. The official autopsy revealed his immediate cause of death: "Multiple organ failure due to refusal to eat or drink with altered mental status due to untreated schizophrenia."

2

8.      Josh suffered and died because of multiple failures by county staff and supervisors, as well as systemic deficiencies and unconstitutional customs, practices, and conditions at the Jackson County Jail. His condition was treatable, and his death was preventable. His estate brings this action under 42 U.S.C. § 1983 to redress the egregious violations of Josh's constitutional rights and to hold Defendants accountable for his unnecessary pain and suffering and death.

## II.      JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over Plaintiff's civil rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

10.      Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's legal claims occurred in this judicial district.

## III.      PARTIES

11.      Plaintiff is the Estate of Joshua A. McLemore, formed under Indiana law and acting through its court-appointed Administrator, Melita L. Ladner. Originally from Mississippi, Joshua McLemore was 29 years old and a resident of Seymour, Indiana, when he died on August 10, 2021, following a 20-day detention at the Jackson County Jail. Josh was in the jail as a pretrial detainee, having been neither tried nor convicted of the alleged crime for which he was arrested. As a pretrial detainee, he was entitled to the protections afforded by the Fourteenth Amendment to the United State Constitution.

12.      Defendant Jackson County is a municipal corporation, organized under the laws of Indiana. Jackson County is a "person" for purposes of 42 U.S.C. § 1983. At all relevant times, the County owned and operated the Jackson County Jail, which housed both pre-trial detainees and convicted prisoners. Acting through the Jackson County Sheriff's Office, the County was

responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies and procedures; and ensuring that the people in its custody received necessary medical and mental health care and humane conditions of confinement, as required under the United States Constitution and other laws.

13.     Defendant Rick Meyer, a resident of Indiana, is the elected sheriff of Jackson County and was so at all times relevant to this case. In that role, Defendant Meyer was responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies and procedures; overseeing the customs and practices of the jail; and ensuring that the people in jail custody received necessary medical and mental health care and humane conditions of confinement, as required under the United States Constitution and other laws. Defendant Meyer was a final policymaker for the Jackson County Jail. At all relevant times he was acting under color of state law. The allegations against this defendant arise from his actions in Indiana and in this judicial district. Plaintiff is suing Defendant Meyer in his individual capacity.

14.     Defendant Chris Everhart, a resident of Indiana, is the commander of the Jackson County Jail and was so at all times relevant to this case. In that role, Defendant Everhart was responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies and procedures; overseeing the customs and practices of the jail; and ensuring that the people in jail custody received necessary medical and mental health care and humane conditions of confinement, as required under the United States Constitution and other laws. Defendant Everhart served as the Responsible Health Authority and was a final policymaker for the Jackson County Jail. At all relevant times, he was acting under color of state law. The allegations against this defendant arise from his actions in Indiana and in this judicial district. Plaintiff is suing Defendant Everhart in his individual capacity.

15.     Defendant Scott Ferguson, a resident of Indiana, was the night-shift sergeant at the Jackson County Jail when Josh was confined there in 2021. He was often the highest-ranking officer on-site at the jail during his shift. In that role, he was responsible for following and enforcing jail policies and procedures. It was also his responsibility to ensure that the people in jail custody received necessary medical and mental health care and humane conditions of confinement, as required under the United States Constitution and other laws. At all relevant times, Defendant Ferguson was acting under color of state law. The allegations against this defendant arise from his actions in Indiana and in this judicial district. Plaintiff is suing Defendant Ferguson in his individual capacity.

16.     Defendant Milton Edward Rutan is a licensed practical nurse (LPN) at the Jackson County Jail. At the time of Josh McLemore's confinement, he was the only medical professional employed at the jail. In that role, he was responsible for providing medical services within the limited scope of his licensure to people confined at the jail, and for referring patients to higher-level medical providers when the patient presented symptoms that were beyond his authority to diagnose or treat. Defendant Rutan is a resident of Indiana. At all relevant times, Defendant Rutan was acting under color of state law and as an employee of Jackson County. The allegations against this defendant arise from his actions in Indiana and in this judicial district. Plaintiff is suing Defendant Rutan in his individual capacity.

17.     Defendant Ronald Everson, MD served as the Jackson County Jail's Responsible Physician pursuant to the County's contract with Advanced Correctional Healthcare, Inc. (ACH), a private jail healthcare provider. He was a policymaker for both Jackson County and Defendant ACH and had final authority regarding clinical issues at the jail and the jail's medical policies and procedures. At all relevant times, Defendant Everson was acting under color of state law. The

allegations against this defendant arise from his actions in Indiana and in this judicial district. Plaintiff is suing Defendant Everson in his individual capacity.

18.     Defendant Advanced Correctional Healthcare, Inc. is a private, for-profit corporation that contracts to provide healthcare services in county jails and other facilities in Indiana and nineteen other states. Incorporated in Illinois and headquartered in Tennessee, the company describes itself as "the largest privately owned county jail health care provider in the United States." At all relevant times, ACH acted under color of state law and pursuant to a contract with Jackson County to provide healthcare services to people confined in the Jackson County Jail. At the time of Josh's confinement, ACH was the jail's only healthcare provider, except for a single county-employed LPN (Defendant Rutan). It agreed to be responsible for critical components of the jail's healthcare program, including the following: providing on-site health evaluations and medical care to people in the jail; establishing healthcare policies, procedures, and practices that were adequate to meet the serious healthcare needs of the jail's population; providing healthcare management and oversight, including continuous quality improvement (CQI) services and supervision of Defendant Rutan; ensuring that patients experiencing a mental health crisis received necessary crisis intervention services; developing treatment plans for patients displaying problematic behavior; coordinating with jail staff to ensure that patients' health needs were met; arranging for off-site medical services when needed; providing staff training and patient health education materials; and providing staff with access to physician consultation 24 hours a day, seven days a week. ACH employed Defendant Everson and empowered him with policymaking responsibilities. By virtue of its contract with Jackson County and through its actual activities, ACH assumed the public function of providing necessary healthcare services to people confined in the county jail. It acted under color of state law in providing those services and was legally

obligated to comply with all requirements of the United Sates Constitution in doing so. ACH is considered a "person" for purposes of 42 U.S.C. § 1983. Its registered agent for service of process is CT Corporation System, 208 South LaSalle St., Suite 814, Chicago, IL 60604. At all material times, ACH was doing regular and systematic business in Indiana. The allegations against this defendant arise from its actions in Indiana and in this judicial district.

## IV.    FACTS

### A.    Josh McLemore

19.     Josh McLemore was born in Gulfport, Mississippi, and raised primarily in nearby Long Beach. He graduated from Long Beach High School and attended Mississippi State University. He enjoyed reading, playing chess, playing video games, and watching sports. His mother, Rhonda McLemore, was a single mother and a member of the United States Navy. She died unexpectedly in December 2022, roughly 16 months after losing her son.

20.     When he was in high school, Josh started having problems related to drug use and undiagnosed mental illness. Eventually he was diagnosed with schizophrenia. Over the years, he received in-patient psychiatric treatment on various occasions and experienced periods of relative stability that allowed him to work and enjoy life. But unfortunately, the mental illness and drug problems returned.

21.     In November 2020, at the age of 28, Josh moved to Indiana, where he obtained employment and established residency. He was living in Seymour at the time of the arrest and jail detention that led to his death.

### B.    Josh was suffering an acute psychotic episode when he was arrested and jailed for pulling a nurse's hair in the emergency room where he was being evaluated.

22.     On July 20, 2021, Josh's mother was feeling anxious about her son's well-being because he hadn't been returning her calls or text messages. She or a friend called the apartment

manager where Josh lived and asked him to check on her son. The manager went to Josh's apartment along with the building maintenance person, where they found Josh on the floor of his bedroom, naked, confused, and incoherent. They called for an ambulance.

23.    An emergency medical responder described Josh's behavior as erratic:

> He wouldn't answer questioning, and when he did answer questions it had no correlation, his answers had no correlation whatsoever to the questioning we were asking. And most of his talk was about prior military, something about the Panama Canal, and it just had no relation to why we were there.

24.    Initially, it was difficult to coax Josh to come down to the ambulance. The EMT thought police might have to bring him to the ambulance by force, but after a while, the EMT's partner was able to get Josh to simply follow him right to the ambulance.

25.    The medical responders reported that Josh was disoriented and gave them the wrong name. They described him as "somewhat cooperative," except when they tried to touch him or come close to him—to obtain vital signs, for instance.

26.    During the transport, Josh sat on the bench in the back of the ambulance. He took the seatbelts off the stretcher and chewed on them. He also leaned down and chewed on the rail of the stretcher. He talked, but nothing he said made sense.

27.    When they arrived at the hospital, Josh had to be coaxed out of the ambulance and into the emergency department. He was displaying signs of mental incoherence and disorientation. At one point he started barking like a dog.

28.    Josh arrived at the Schneck Medical Center Emergency Department at approximately 1:20 a.m. on July 20, 2021. An initial nursing assessment revealed that he lacked comprehension and had impaired memory and rambling speech. The nurse described his mood as hostile, suspicious, anxious, and apprehensive.

29.     Hospital records indicated that Josh had a history of schizophrenia and substance use, and the doctor who examined him later noted that he had been seen at the hospital previously for psychosis and drug use. When asked, Josh acknowledged having used methamphetamine.

30.     Roughly a half hour after Josh arrived in the emergency room, a nurse noticed him get out of bed and lay on the floor. She walked into his room, tapped him on the shoulder, and asked him to get up. Consistent with the EMT reports describing his aversion to people getting too close, Josh reacted by pulling her hair.

31.     A hospital security guard—who happened to be an off-duty Jackson County Sheriff's detective—told Josh to get back into bed and not to touch the nurses. Josh complied and no further incidents occurred. Nevertheless, the officer contacted the Seymour Police Department, which responded by sending four more officers to the hospital. The officers arrested Josh for pulling the nurse's hair, placed him in handcuffs and leg shackles, and carried him out of the hospital, naked except for his underwear.

32.     The doctor who saw Josh in the ER recorded her impressions as "agitation" and "substance abuse" but later acknowledged that his presentation was also consistent with mental illness.

33.     As the officers were placing Josh into the police car, he bit the top of the car door.

34.     The police transported Josh to the Jackson County Jail. On the way, he was singing, hollering, and blurting out random sounds and statements. At one point, the officer driving the car asked him, "Are you licking my computer?"

35.     Josh arrived at the jail in the early morning hours of July 20, 2021. Multiple officers removed him from the police car, handcuffed and shackled, and carried him inside. Jail staff did not perform any of the customary book-in procedures that are standard at virtually all jails upon

the arrival of a new detainee. They did not take Josh's photograph or fingerprints. They did not conduct an intake medical or mental health screening. And even though staff were aware that Josh had been brought to the jail directly from the hospital, they did not contact any medical professional to evaluate him, discover why he was in the hospital, or determine whether he could safely be detained at the jail, given his mental state and the jail's limited medical and mental health resources.

36.    Because no healthcare provider conducted a routine intake medical screening, no one took Josh's baseline vital signs, obtained information about his medical or mental health history, or requested his medical records or prescription medication information from any community providers.

37.    Instead of taking him through the typical booking process, jail staff carried Josh directly to a padded isolation cell in the book-in area known as Padded Cell 7. He would remain there almost continuously, in what the County's own policies define as "extreme isolation," until leaving the jail in an ambulance approximately 20 days later, in dire condition, roughly 48 hours from death.

**C.    Jackson County officials kept Josh locked in solitary confinement, naked, for the next three weeks, where he continued to suffer from active psychosis while receiving no medical or mental health treatment and virtually no human contact.**

38.    Padded Cell 7 ("PAD7") is a small cell located just a few feet from the book-in area officer station. When the officers placed Josh in the cell, it was empty and bare. There was nothing to look at, nothing to listen to, and nothing to sit or lie on. The stark, off-white walls and floor were brightly illuminated by overhead fluorescent lights 24 hours a day. There were no windows, except for a small opening in the cell door, which was covered on the outside by a steel flap that prevented Josh from looking out. As Josh spent hour after hour, day after day, alone in the

windowless cell, it was impossible for him to know what day it was, what time it was, or even whether it was day or night.

39.     Three officers carried Josh into PAD7 and placed him on the floor, his hands still cuffed behind his back and his ankles still shackled, as he continued to blurt out incomprehensible words and sounds. They then stepped out of the cell for a moment, leaving Josh lying on the floor in a fetal position, still naked except for his underwear. When they returned moments later, two officers hoisted Josh up off the floor and pinned him against the wall. One officer removed the handcuffs, and then, as three officers kept Josh pinned tightly against the wall, a fourth tried to force his arm into a green jail smock. When the officer encountered difficulty he gave up, threw the smock on the floor, and ordered the other guards to "get his underwear." The remaining guards proceeded to remove Josh's ankle shackles and strip him of his only item of clothing. They then forced him to his knees and placed him in a corner of the cell, where he knelt with his face wedged into the corner. The officers then exited the cell and closed the door, leaving Josh alone in a corner, naked, detached from reality, with only the suicide smock and a thin blanket lying on the floor nearby.

40.     For the next few minutes, Josh moved around on his knees, licking the walls and floor of his cell, sat on the floor, fidgeted, made random sounds and statements, and asked himself, "Where am I?"

41.     A ceiling-mounted surveillance camera in PAD7 provided jail staff with the ability to monitor Josh's every movement and sound in real time over the next 20 days. The system also recorded, but only when it detected a certain amount of motion, resulting in hundreds of hours of surveillance footage interrupted by frequent skips and jumps. (For reasons that are not yet clear, the video contains many skips and jumps at moments where motion can clearly be detected.) The

video spans more than 400 hours and shows—starkly and unmistakably—the inhumane nature of Josh's confinement, his active psychosis, and his deteriorating condition over the course of his confinement.

42.     Exhibit 1, which can be viewed by clicking the link below, provides a glimpse of Josh's mental state during the first few minutes of his confinement in PAD7. (Note: The videos linked in this complaint contain nudity, which has been partially blurred.) **Exhibit 1**

43.     Jail Sergeant Scott Ferguson was present when Josh arrived and was one of the officers who put him in PAD7.

44.     In light of how Josh was acting, Sgt. Ferguson immediately placed him on "Medical Observation," which required jail staff to observe him on a video monitor at least every 15 minutes and document their observations on a log.

45.     Josh was placed on Medical Observation because officers were aware that his mental state was so severely compromised that he was at risk of substantial harm. But despite the term "Medical Observation," Josh was not medically observed. In fact, he received virtually no medical monitoring or care of any kind throughout his confinement, even as his psychosis persisted and his physical condition worsened.

46.     Josh was on "Medical Observation" for the entirety of his pretrial detention—a total of approximately 20 days. However, the required observation logs were maintained only for the first seven-and-a-half days. Those logs were incomplete and provided little useful information regarding Josh's mental state. For the rest of Josh's time in the jail, the required 15-minute observations were either not performed or not documented. Nevertheless, documents, surveillance video, and witness interviews reveal that Josh spent his entire time in the Jackson County Jail in a state of untreated active psychosis, naked, unable to care for himself, barely able to communicate,

and isolated from all but the briefest human contact—all while Jackson County Jail employees carried on with their regular tasks just a few feet away, on the other side of his cell wall.

**D.**   **Josh remained wide awake for most of his time in solitary confinement, displaying erratic and abnormal behaviors that would have made it obvious to any lay person that something was seriously wrong with him and that he was at risk of substantial harm.**

47.   Josh barely slept during the course of his confinement. An Indiana State Police detective who reviewed the jail surveillance video as part of an official investigation of Josh's death estimated that he slept for approximately 15 hours *total* during the roughly 20 days he spent locked up in the Jackson County Jail—an average of less than one hour of sleep per day.

48.   Extreme sleep deprivation is dangerous. It can cause hallucinations, mood changes, distorted thinking, and delusions after just 24 hours—even in healthy people without a preexisting mental illness. Other potential symptoms include nonsensical speech, motor incoordination, unsteadiness, and dissociation. Multiple studies have shown that prolonged sleep loss can precipitate psychosis. Extreme lack of sleep is also physically dangerous.

49.   For almost three weeks, Josh spent his waking hours sitting down, getting up, lying on the floor, staring into space, randomly gesticulating, twirling his blanket, playing with his food, rolling around in trash, smearing his feces, eating paper, randomly twisting his body into various contortions, staring into the security camera, chewing Styrofoam, and attempting in vain to look out of the covered window in his door, as well as displaying other erratic and peculiar behaviors. When he wasn't silent, he could be heard shouting out, laughing spontaneously, making bizarre sounds, or blurting out nonsense or gibberish. Exhibit 2 contains just a few examples of how Josh appeared and sounded at various points throughout his confinement. All of this occurred in plain view of the jail staff who had the ability to monitor him continuously and who were supposed to be observing him no less than every 15 minutes. **Exhibit 2**

13

**E.     Josh had virtually no meaningful access to a toilet while confined.**

50.     Josh's padded isolation cell was a dry cell, meaning there was no sink or toilet in it. A second door in the cell led to a bathroom that contained a toilet, a sink, and a shower. However, jailers kept that door locked. The only way Josh could have used that bathroom was by asking the guards to unlock the door; but due to his mental state, he could not communicate such a request.

51.     There is nothing in the records to indicate that jail staff told Josh there was a bathroom on the other side of that second door until August 3—14 days after he entered the jail— when a staff member opened the bathroom door and left it open for approximately four hours. During that time, Josh wandered into the bathroom and rolled around on the floor but did not use the toilet or sink. Even if Josh had known about the bathroom earlier, it is likely he would not have understood its purpose, remembered how to access it, or been able to communicate his needs due to his constant psychotic state.

52.     Being in such a state and having virtually no access to a bathroom, Josh would urinate and defecate on his cell floor. He did this multiple times while he was locked in PAD7. He walked barefoot in his own human waste, rolled around in it, and ate food from it. He lay on a urine-covered mat and wrapped himself in a urine-soaked blanket. He did all of this in plain view of the guards who were supposed to be monitoring him every 15 minutes. But not a single jail employee took any steps to address this problem, choosing instead to allow Josh to continue relieving himself in the small, confined space where he spent virtually every minute of every day.

**F.   Jail staff kept Josh locked up in his small cell 24 hours a day, seven days a week, except when they pulled him out and strapped him in restraints so they could put him under the shower or clean his cell.**

53.     Indiana law and Jackson County Jail policies require that people in solitary confinement be allowed out of their cell for at least one hour every day. Jail employees ignored that requirement with regard to Josh. Instead, they kept him locked up by himself in his padded isolation cell every second of every day for almost three straight weeks, except for the four instances described below.

54.     On **July 25, 2021**, at approximately 9:30 a.m., four guards gathered in front of Josh's cell door. One of them opened the door, and as Josh casually took a step outside the cell, three of the guards grabbed him. Two held Josh's right arm behind his back while the third put him into a choke hold and took him to the ground. Two of the guards pinned Josh to the floor face-down with their bodies and tied his hands behind his back. As Josh lay on the floor, not resisting, the guards put him in a restraint device called the WRAP. They bound his legs and ankles together tightly, placed a harness over his head, and strapped the harness to the bottom of the wrap, forcing him into a sitting position. They then placed a helmet on his head.

55.     The guards forced Josh to sit on the floor like this outside his cell, naked and bound, exposed to both male and female staff and detainees, for more than 15 minutes while staff had another prisoner clean his cell. After the cell was swept and mopped, three guards carried Josh back into his cell and set him on the floor, still bound up in the WRAP with his hands tied behind his back. Below is a still image from the surveillance footage, showing Josh in the WRAP after the guards locked him back up in the isolation cell.



56.     Jail staff kept Josh bound up in the WRAP for over *four-and-a-half hours*, in violation of jail policy and in violation of his constitutional rights to be free from excessive force or unreasonable restraint. For most of this time he was alone in his cell. The purported reason for this prolonged restraint was that one guard claimed to have seen Josh on the monitor, punching himself in the head and slapping his stomach. However, video from the relevant timeframe does not show Josh doing anything that would cause a reasonable officer to believe he was trying to hurt himself.

57.     After the guards released Josh from the WRAP, they finally gave him a mat that he could lie on—more than five days after first locking him in solitary confinement.

58.     The next time Josh was taken out of his cell was on **July 27, 2021**. That morning, staff apparently decided to give Josh a shower and have his cell cleaned. Having no mental health professional at the jail, no treatment plan for Josh, no strategy for his care, and no idea how to

safely and humanely engage with a person suffering from psychosis, custody staff resorted to the only tools they had been trained to use: force and restraint.

59.     As Josh lay in his cell, posing no threat, five officers entered. Three of them pinned Josh to the floor, face-down, and tied his hands behind his back, while a fourth tried to speak to him and a fifth stood and watched. The guards removed Josh from his cell and strapped him, naked, into a restraint chair.

60.     Josh put up no resistance to this unreasonable and unnecessary use of force. He sat, wrists bound behind his back, and allowed two guards to hold him down while two others strapped him into the restraint chair. He could be heard speaking unintelligibly and making other sounds. As all this was happening, Defendant Sheriff Meyer stood several feet away, behind a desk, watching. He made no effort to intervene to prevent the unconstitutional use of force and restraint. Defendants Commander Everhart and Nurse Rutan also stood by and watched this incident without intervening.

61.     Once Josh was fully strapped into the chair, the guards wheeled him a few feet into a nearby bathroom. When Josh raised his legs at one point, the guards responded by placing metal shackles around his ankles and locking them to the chair frame. Three guards lifted the chair into a small shower stall, stepped back, turned the water on, and walked out of the bathroom—leaving Josh sitting under the shower, fully restrained and helpless, as the water hit him and poured off his body. One guard stood in the doorway and watched. At some point another guard came in with a couple paper cups of liquid soap, poured them over Josh's body, and walked away.

62.     The guards left Josh in the shower, fully restrained and helpless, for approximately 12 minutes while another detainee cleaned his cell. After removing him from the shower, they dried him off before releasing him from the restraint chair and returning him to his cell. Defendant

Rutan took (or attempted to take) one or more of Josh's vital signs while this was happening, but he did not document them.

63.    Exhibit 3 shows much of the July 27, 2021 incident described above. **Exhibit 3**

64.    The jail employees' actions during this incident were unreasonable and excessive and were performed with the knowledge and approval of Defendants Sheriff Meyer and Commander Everhart.

65.    Defendants Meyer, Everhart, and Rutan, having observed these events firsthand, and having knowledge of other facts surrounding Josh's condition and the manner in which he was being housed, were fully aware of Josh's active psychosis, his unfitness for continued confinement, the inhumane conditions of his confinement, and the fact that further confinement in the jail under the same or similar conditions would subject Josh to serious risk of harm.

66.    Josh was removed from his cell a third time on **July 31, 2021**, again for the purpose of putting him in the shower and cleaning his cell. Because the jail had no mental health professional, and because the guards were not trained or equipped to engage with a severely mentally ill person in a safe and humane manner, events unfolded similarly to how they did on the 27th. With no threat of harm to justify their actions, guards entered Josh's cell, pinned him to the ground, tied his wrists together behind his back, strapped him into a restraint chair naked (exposed to both male and female officers), and stuck him under the water while an officer cleaned his cell. The use of force and restraints in this instance was unreasonable and unnecessary and could have been avoided if Josh had been referred for the professional mental health treatment he so obviously and desperately needed.

67.    Josh remained locked in solitary confinement with no reprieve until the afternoon of **August 8, 2021**, when guards pulled him out of his cell for the fourth time, strapped him into

the restraint chair, and wheeled him to the shower while his cell was being cleaned. The details of this scene, which differ from those of the prior incidents, will be described later in this complaint. *See* ¶¶ 73-89.

68.     The actions described above—keeping Josh locked up in isolation 24 hours a day and subjecting him to physical force and restraints in order to put him under a shower and clean his cell—were excessive in relation to any legitimate security concerns the jail may have had and were objectively unreasonable.

**G.     As a result of his psychosis, Josh's nutritional intake at the jail was dangerously insufficient and put him at risk of serious harm, including death, from malnutrition and dehydration.**

69.     Two or three times a day, a Styrofoam box or paper bag containing food appeared through a small opening in Josh's cell door, delivered with little or no human interaction. The food slot was secured by a steel flap that could be opened by the guards. On most occasions, particularly in the latter days of his confinement, Josh either failed to retrieve his food or retrieved it only to dump some or all of it on the floor. Relatively little of the food Josh received made it into his mouth. Instead, it ended up littering the floor of his cell along with urine, feces, and scraps of paper and Styrofoam he tore from the food containers.

70.     On July 28, Officer Beverly Lane created a log entry in the jail's computer system, documenting that Josh had rejected his breakfast meal and drink. When she asked him if he wanted it, he mumbled words she could not understand. She created this log because she and other officers had noticed that he hadn't been eating and, recognizing the dangers associated with potential malnutrition, decided they were going to keep a record. However, no food or fluid record was actually maintained; Officer Lane's July 28 log entry was the only written documentation of the issue.

71.     Josh's fluid intake in the jail, like his food consumption, was severely inadequate. According to the Indiana State Police detective who investigated Josh's death, he retrieved only about 19 drinks that were delivered through his food slot in small Styrofoam cups or Gatorade bottles over the roughly 20 days of his confinement. As a result of his ongoing, untreated psychosis, he drank very little, especially during the latter part of his confinement, and often spilled his drink on himself or the floor of the cell.

72.     Over time, the lack of food and water, extreme sleep deprivation, lack of human contact, denial of time outside of his cell, and the other grossly inhumane conditions of his confinement—combined with a lack of any care or treatment whatsoever—took an inevitable and serious toll on Josh's physical health. As noted above, Josh weighed 197.8 pounds when he arrived at the Jackson County Jail on July 20, 2021. When he left the jail in an ambulance on August 8, he weighed just 153 pounds, meaning he lost almost 45 pounds in less than three weeks. This happened while he was under the constant supervision of jail staff who were constitutionally required to protect him from harm. It also happened while he was on constant "medical observation."

## H.     Josh's last day at the Jackson County Jail

73.     Josh's last day at the Jackson County Jail was Sunday, August 8, 2021. Throughout most of the day he lay on the mat in his isolation cell, surrounded by filth and waste that had accumulated over the previous days. Feces and debris were stuck to his body, which now appeared bony and emaciated compared to his appearance when he arrived at the jail 20 days earlier, as shown below.

July 20, 2021:



August 8, 2021:



74.     At approximately 7:15 a.m., a guard placed a Styrofoam box containing breakfast in Josh's food slot. It sat there for the next five hours as staff went about their duties, passing by Josh's cell, the white box conspicuously unmoved. Nobody bothered to check on Josh, or even open the window cover to look inside his cell. This was not atypical; it reflected the jail staff's lack of attention to Josh's well-being over the entire course of his confinement.

75.     When lunchtime came, at around 12:20 p.m., a guard removed the untouched breakfast box from Josh's food slot and replaced it with a box containing lunch. Apparently unfazed by the fact that Josh had failed to retrieve his breakfast over the previous five hours, the guard did not look into the cell to check whether Josh was okay. He wasn't.

76.     Josh's lunch, like his breakfast, sat in the food slot untouched, in full view of every staff member who walked by his cell.

77.     Finally, at approximately 4:07 p.m., Defendant Rutan came to Josh's cell and called his name through the food slot. A minute or so later, a guard opened the door, stepped inside, and placed a bottle of orange Gatorade on the floor. As Josh strained unsuccessfully to reach for the drink, Nurse Rutan stepped inside the cell, removed the cap, and handed the bottle to Josh, who struggled to drink but was too weak to do so. Nurse Rutan got a straw and held the bottle up to Josh's mouth so he could drink. He drank nearly the entire bottle while lying on his mat, covered in dirt, occasionally letting out a cough or cry between sips.

78.     Despite Josh's dire condition, which should have been obvious to anyone who looked at him, Defendant Rutan did not call for an ambulance, did not call his physician supervisor, Dr. Everson, and did not take other action to help Josh. He simply went on with his other duties.

22

79.     As Josh lay on his mat, listless and near death, four officers were hanging out at the

officer station just a few feet away. One of the officers appeared to be scrolling through his social

media feed on his iPhone.

80.     At approximately 4:42 p.m., a guard stepped inside Josh's cell and asked him if he

could stand up. When Josh responded with nothing but a weak moan, two guards each took ahold

of one of his arms and dragged his naked body out the cell door. A third guard helped hoist him

into the restraint chair, which was sitting just outside the cell, and a fourth wheeled him away.

Although it was evident that Josh could not stand or bear weight because he was so weak and ill,

they handcuffed his wrists to the chair.

81.     A reasonable observer of this scene might feel some relief, thinking jail staff were

finally taking Josh to get the medical help he so obviously needed. But that's not what they were

doing. Instead, they had decided that the highest priority at that moment was to give Josh another

shower and clean his cell. According to Defendant Rutan, they wanted to get Josh "cleaned up"

for the ambulance. Meanwhile, nobody bothered to call an ambulance for at least another hour.

82.     A female officer wheeled Josh into the bathroom. Then, as Josh sat there sluggish

and weak, barely able to hold his head up, she and two other officers stood around trying to figure

out how to maneuver the restraint chair into the shower stall. After about four minutes of this

absurdity, Defendant Rutan stepped into the bathroom and held the bottle of orange Gatorade up

to Josh's mouth again, allowing him to sip from the straw.

83.     When Josh finished what was left of the Gatorade, Nurse Rutan left the bathroom

and returned with a small cup of water or juice, which Josh also drank.

84.     The female officer filled up several plastic pitchers of water and poured them over

Josh's naked body. Then she put some soap on a towel, scrubbed him down, and rinsed him off

23

with more pitchers of water as another officer—and sometimes a third officer and Nurse Rutan—watched. Meanwhile, two other jail detainees were summoned to clean Josh's cell.

85.     The officers hoisted the restraint chair up into the shower stall and parked it there for the next 13 minutes, allowing the shower water to spray down continuously over Josh's motionless body.

86.     Eventually they wheeled Josh out of the shower stall and toweled him off, his body now slumped to the side.

87.     Officers then uncuffed Josh's hands and transferred him to an actual wheelchair, at which time it was blatantly obvious that he could not support any of his own body weight.

88.     They wheeled Josh out of the bathroom, back into the unit, where they left him sitting naked (except for a towel that the female officer placed over his lap) in front of guards and prisoners for more than ten minutes while they waited for his cell to be ready. They continued to offer Josh fluids, which he accepted.

89.     Once the isolation cell was clean, the staff wheeled Josh back inside, placed him on the mat, and covered him with a blanket.

90.     Defendant Rutan stood over Josh and asked, "You gonna wake up a little bit?" Josh remained motionless except for turning his head occasionally.

91.     Defendant Rutan took Josh's pulse and continued to try to rouse him. He told Josh to sit up, but Josh just lay there and moaned.

92.     A few moments later, Defendant Rutan returned with a glucose monitor and pricked Josh's finger to check his blood sugar level—twice. He told the officers his blood sugar level was 232, which is well above normal. He then took Josh's blood pressure. He did not record any of the vital sign results.

93.     Meanwhile, as Nurse Rutan was taking Josh's vital signs, an officer decided that he needed medical attention, so she called for an ambulance. But by then it was too late.

94.     EMTs arrived at the jail just before 6:00 p.m. and transported Josh to Schneck Medical Center. They noted in their report that Josh's cell "smelled like old urine and the blanket he was covered up with was covered in urine. There was urine all over the floor."

95.     Exhibit 4 shows how jail staff treated Josh on August 8, his last day at the Jackson County Jail. **Exhibit 4**

96.     Josh spent almost four hours in the Emergency Department at Schneck Medical Center, where he was diagnosed with hypoxia (insufficient oxygen in his body tissues), encephalopathy (disease affecting brain function), acute renal failure, hypernatremia (too much sodium in his blood, indicative of severe dehydration), and rhabdomyolysis (breakdown of damaged muscle tissue, characteristic of someone who has been lying in one place for a long time without normal movement).

97.     Josh was so severely ill as a result of his confinement at the Jackson County Jail that his needs were beyond the capacity of Schneck's clinical resources. As a result, he was airlifted to Mercy West Hospital in Cincinnati, Ohio.

98.     When Sheriff Meyer learned that Josh would be flown to Cincinnati for care, he decided to release him from County custody.

99.     Josh was admitted to Mercy West at 12:15 a.m. on August 9, 2021. He arrived intubated and sedated. Despite aggressive treatment, his condition was past the point where medical professionals could reverse the damage that had been done, and he remained unresponsive.

100.     As of the morning of Tuesday, August 10, Josh was comatose and on life support. His mother flew up from Mississippi and arrived at the hospital that afternoon. After consultation

with Josh's medical providers, she made the excruciating decision to withdraw life support. He died at 5:05 p.m.

101. A deputy coroner for Hamilton County (Ohio) performed an autopsy and concluded that the immediate cause of Josh's death was "Multiple organ failure due to refusal to eat or drink with altered mental status due to untreated schizophrenia."

102. While Josh was in the ICU at Mercy West, staff noticed that his anus was extremely distended and that there was trauma to the skin around his rectum and seeping fluid. The doctor who performed Josh's autopsy documented areas of submucosal hemorrhage of the rectum and anus. Hospital staff suspected he might have been sexually assaulted in the jail. When the Indiana State Police investigator reviewed the jail surveillance footage, he did not see a sexual assault. However, he did see multiple occasions with Josh appeared to insert a plastic Gatorade bottle into his anus. Jail staff could see Josh doing this in real time on the surveillance monitor, but took no steps to intervene and protect Josh from hurting himself. Josh's injuries were yet another consequence of jail staff keeping Josh confined in a state of active psychosis, without needed care or treatment, despite his unfitness for confinement.

I. **Josh McLemore's suffering and death were the result of multiple acts of indifference, as well as systemic and unconstitutional deficiencies relating to the County's services, policies, procedures, customs, practices, and training programs.**

103. After reviewing the state police investigation of Josh's death, Jeffrey Chalfant, the Jackson County Prosecuting Attorney, concluded, "Mr. McLemore most likely died due to a prolonged lack of attention by Jackson County Jail staff as a group." This explanation, though accurate, is incomplete. Josh's suffering and death was caused by numerous factors, including those described below.

Deliberate Indifference by Defendant Sheriff Meyer

104.    Jackson County Sheriff Rick Meyer was a county policymaker with final authority over jail policy and operations. His actions are directly attributable to the County for purposes of the County's Section 1983 liability.

105.    Sheriff Meyer was fully aware of the facts and circumstances surrounding Josh's inhumane confinement, the excessive force and restraint used against him, his lack of treatment and care, and his continued deterioration as described in this complaint.

106.    On July 27, 2021, Defendant Meyer stood back and watched as officers he supervised used unreasonable force and restraint to put Josh in the shower and facilitate the cleaning of his cell. He knew the officers' actions were unreasonable and in violation of jail policy, done for the officers' convenience and not due to necessity. Yet he failed to intervene, acquiescing in, condoning, and approving the officers' conduct.

107.    Defendant Meyer was aware that Josh had serious mental health problems—not only because he was able to witness this with his own eyes, but because he was told. A member of the Seymour, Indiana Police Department had contacted him early on and conveyed concern about Josh's mental health. He told Defendant Meyer he had spoken with Josh's mother and that Josh had previously been hospitalized for mental illness. He knew Josh was unable to keep his cell clean and unable to bathe himself. He personally witnessed Josh's demeanor during the use-of-force and restraint incident shown in Exhibit 3 and was otherwise aware that Josh was not fit to be confined in the jail and that the jail lacked the means to provide him the care he needed.

108.    Despite his knowledge, Defendant Meyer never spoke with Nurse Rutan or any other medical or mental health professional about Josh before he left the jail in an ambulance. He did not take any steps to provide Josh with the mental health care that he obviously needed and

27

that the Constitution required. Instead, he allowed Josh to continue suffering in his jail with active psychosis in prolonged isolation.

109.    Defendant Meyer's decisions to allow his staff to keep Josh locked up in continuous solitary confinement with no medical or mental health care, despite the obvious risks, and to subject Josh to unreasonable and unnecessary force and restraint, violated correctional standards of care, were objectively unreasonable, and reflected deliberate indifference to Josh's serious medical and mental health needs and constitutional rights. They caused Josh to endure unnecessary pain, suffering, and death, in violation of the Fourteenth Amendment to the United States Constitution. As a county policymaker, Defendant Meyer's acts and omissions are attributable to Jackson County for purposes of liability under 42 U.S.C. § 1983.

110.    Defendant Meyer acted with intent, malice, deliberate indifference, gross negligence, and/or reckless disregard for Josh's constitutional rights.

Deliberate Indifference by Defendant Commander Everhart

111.    Jackson County Jail Commander Chris Everhart was a county policymaker with authority over jail policy and operations. His actions are directly attributable to the County for purposes of the County's Section 1983 liability.

112.    Defendant Everhart was fully aware of the facts and circumstances surrounding Josh's inhumane confinement, the excessive force and restraint used against him, his lack of treatment and care, and his continued deterioration as described in this complaint.

113.    On July 27, 2021, Defendant Everhart stood back and watched as officers he supervised used unreasonable force and restraint to put Josh in the shower and facilitate the cleaning of his cell. He knew the officers' actions were unreasonable and in violation of jail policy,

done for the officers' convenience and not due to necessity. Yet he failed to intervene, acquiescing in, condoning, and approving the officers' conduct.

114.    Defendant Everhart was aware that Josh had serious mental health problems. Sheriff Meyer had informed him about the call from the Seymour police officer, letting him know about Josh's mental health history. In addition, Defendant Everhart spoke with Josh's mother on July 27, 2021. She told him that Josh suffered from drug-induced manic episodes and mental health issues, and that he had been hospitalized for mental illness four times in Mississippi. He knew Josh was unable to keep his cell clean and unable to bathe himself. He personally witnessed Josh's demeanor during the use-of-force and restraint incident shown in Exhibit 3. He recognized Josh's erratic behavior at that time and believed he might have mental health issues. He knew that Josh's public defender had visited Josh in the jail, after which he filed a motion, asking the Court to order a mental health evaluation. He was aware that Josh was not fit to be confined in the jail and that the jail lacked the means to provide him the care he needed.

115.    Despite his knowledge, Defendant Everhart never spoke with a mental health professional about Josh and did not take any steps to provide him with the mental health care that he obviously needed and that the Constitution required. Instead, he allowed Josh to continue suffering with active psychosis in prolonged isolation.

116.    Defendant Everhart's decisions to allow his staff to keep Josh locked up in continuous solitary confinement with no medical or mental health care, despite the obvious risks, and to subject Josh to unreasonable and unnecessary force and restraint, violated correctional standards of care, were objectively unreasonable, and reflected deliberate indifference to Josh's serious medical and mental health needs and constitutional rights. They caused Josh to endure unnecessary pain, suffering, and death, in violation of the Fourteenth Amendment to the United

States Constitution. As a County policymaker, Defendant Everhart's acts and omissions are attributable to Jackson County for purposes of liability under 42 U.S.C. § 1983.

117.    Defendant Everhart acted with intent, malice, deliberate indifference, gross negligence, and/or reckless disregard for Josh's constitutional rights.

<u>Deliberate Indifference by Defendant Ferguson</u>

118.    Once Josh arrived at the Jackson County Jail, his safety and well-being were wholly in the hands of jail officials. If jail officials failed to meet his basic needs—food, water, necessary medical and mental health care—there was nobody else to help him.

119.    A written jail policy required jail staff to conduct a health-related screening of all people being booked into the jail.

120.    Defendant Ferguson was the highest-ranking officer at the jail when Josh arrived in the early-morning hours of July 20. He personally accepted Josh for confinement in the jail and participated in placing him in PAD7. Sgt. Ferguson did not complete the required health screening because he recognized Josh would not be able to participate in the process due to his condition. As he later put it, Josh was speaking incoherently, "just saying a bunch of numbers, talking out of his head . . . just random stuff."

121.    Due to Josh's condition, Defendant Ferguson also was unable to perform many of the other routine booking tasks, such as taking a booking photo, providing him with the inmate handbook, and completing certain forms.

122.    Another written policy required custody staff to assess whether new detainees were "fit for confinement." One purpose of the policy was to "facilitate care and treatment for persons in need of urgent medical or mental health care outside the realm of services rendered inside [the jail]." The policy identified "recent onset of mental confusion or impairment" as one example of

conditions that may indicate a person is not fit for confinement." When custody staff suspected that someone may be suffering from a serious condition like that, they were to direct the transporting officer to take the person to a hospital or urgent care facility for medical clearance before allowing the person to be booked into the jail. If the condition was questionable, staff were required to contact the jail's on-call medical practitioner for further guidance.

123.    Defendant Ferguson was aware that Josh was mentally incapable of following standard jail booking procedures when he arrived at the jail on July 20. He was aware that Josh was unable to communicate coherently, answer simple questions, or stay clothed. He was concerned enough about Josh's condition that he immediately placed him on Medical Observation, requiring staff to observe him at least every 15 minutes and document their observations. It was obvious to Defendant Ferguson—as it would have been to any lay person—that Josh was experiencing severe mental confusion and impairment and was therefore unfit to be confined in the Jackson County Jail.

124.    Defendant Ferguson was aware that the jail had very limited medical and mental health resources.

125.    Despite Defendant Ferguson's knowledge of Josh's severe mental impairment, his inability to answer basic questions about his physical and mental health or to communicate coherently, and the jail's lack of resources to safely manage and treat someone in Josh's condition, he accepted Josh for confinement in violation of jail policy. He did not even attempt to call Dr. Everson to report Josh's condition and request guidance, as required.

126.    Defendant Ferguson's decisions to accept Josh for confinement in violation of jail policy, and to keep him confined there despite the obvious risks, violated correctional standards of care, were objectively unreasonable, and reflected deliberate indifference to Josh's serious medical

31

and mental health needs. They caused Josh to endure unnecessary pain, suffering, and death, in violation of the Fourteenth Amendment to the United States Constitution.

127.    Defendant Ferguson acted with intent, malice, deliberate indifference, gross negligence, and/or reckless disregard for Josh's constitutional rights.

<u>Deliberate Indifference by Defendant Rutan</u>

128.    At the time of Josh's confinement, Defendant Rutan was the only medical professional employed by Jackson County to provide in-person medical care to people in the Jackson County Jail.

129.    Defendant Rutan had a duty to ensure that people in the jail received constitutionally adequate medical and mental health care. If he was unable to provide the care himself due to limitations on his knowledge or skills or the scope of his nursing license, he was required to take necessary steps to make sure the patient received the necessary care from another qualified provider. This gatekeeping role was essential.

130.    Defendant Rutan worked at the jail on Tuesday, July 20, 2021—the day Josh was brought in. The medical unit was right next to Josh's cell. Defendant Rutan passed by his cell multiple times that day. He was aware of Josh's presence in PAD7 and his behavior. However, he made no effort to assess Josh or interact with him that day. Nor did he contact Dr. Everson that day to notify him about Josh or receive instruction regarding how to manage Josh's medical and mental health needs.

131.    Defendant Rutan worked at the jail on Wednesday, July 21 as well. Although he passed by Josh's cell multiple times that day, he made no effort to assess Josh or interact with him. He also did not contact Dr. Everson that day to notify him about Josh or receive instruction regarding how to manage Josh's medical and mental health needs.

132.    According to the available records, the first time Defendant Rutan interacted with Josh was on Thursday, July 22, at approximately 6:09 p.m.—more than 63 hours after Josh was first locked up in isolation. During that interaction, Nurse Rutan stood a few feet back from Josh's cell door and attempted to speak to him through the food slot. Josh waved his arms through the food slot and responded nonsensically. The entire interaction lasted approximately one minute and 20 seconds. At the end of the interaction, Nurse Rutan tossed a bottle of Gatorade through the food slot—the way one would toss a piece of meat to a wild animal in a cage—before closing it.

133.    Defendant Rutan ignored Josh on July 23, July 24, and July 25.

134.    On Monday, July 26, a jail officer spoke to Defendant Rutan, expressing concern about Josh. In response, Nurse Rutan walked over to Josh's cell and looked at a form posted on the door. However, he made no effort to interact with Josh or evaluate him in any way. He did not even bother to open the window cover to look inside the cell.

135.    On Tuesday, July 27, Defendant Rutan watched as multiple guards forcibly removed Josh from his cell and strapped him into the restraint chair so they could stick him under the shower while someone else cleaned his cell. Later that morning, Defendant Rutan was present in the book-in unit when a scream could be heard coming from Josh's cell. Defendant Rutan ignored the scream.

136.    Several hours later, as Defendant Rutan was chatting with guards at the officer station just outside of Josh's cell, a loud scream could be heard. However, Nurse Rutan simply walked away, passing in front of Josh's cell without even pausing to look inside. Defendant Rutan took no steps that day to evaluate Josh or to obtain medical or mental health services for him.

137.    On Wednesday, July 28, Defendant Rutan made the following note in Josh's medical chart sometime between 10:11 and 10:39 a.m.:

> Mr. Mclemore is extremely confused and aggressive. Doesn't appear to be able to comprehend what people are telling/asking him. Responses are active but gibberish. He occasionally makes statements that are comprehensive [sic], but I don't believe he full [sic] understands what he has said.
>
> Because of his aggressive behavior and current mental condition, Mr. Mclemore will be under constant visual supervision for his stay here.
>
> He is also unable to sign or agree to the Suicide release form.
>
> Dr. Everson updated.
>
> T.O. Discontinue Suicide Watch, but continue under close observation

138.    Although the telephone order Nurse Rutan documented was to discontinue suicide watch, there is no documentation of Josh ever having been placed on suicide watch in the first place.

139.    Although Defendant Rutan claimed that Josh was "extremely aggressive" that morning, there is no surveillance footage corroborating this.

140.    Defendant Rutan documented nothing further about Josh until August 9, 2021— roughly 24 hours *after* Josh was removed from the jail and taken to the hospital. That is because he did not evaluate, treat, care for, or help Josh in any way between July 28 and August 8, when he gave Josh some Gatorade and took his vital signs. Instead, he shirked his essential gatekeeping responsibility during that extended period, leaving Josh to continue decompensating without care or treatment.

141.    Defendant Rutan claimed in his August 9 chart note that he tried to communicate with Josh and offer him Gatorade twice, around July 29 and July 31. He wrote that Josh was "uncooperative," "grabbing after staff through the bean hole [food slot]," and that he poured a bottle of Gatorade under his cell door out into the holding area. Under the section of the note labeled "PLAN," Nurse Rutan wrote, "Still very uncooperative with care and unable to get vital

signs." None of Defendant Rutan's statements in this post-hoc chart note are corroborated by the recorded surveillance video.

142.    Jackson County Jail policy required a qualified healthcare professional to conduct an initial health evaluation on all detainees within 14 days of their admission to the jail. This evaluation was to include a mental health history, vital signs, and symptom data. Defendant Rutan failed to conduct this evaluation even though he knew it was required and even though Josh was desperately in need of such an evaluation (at a minimum).

143.    Jail policy also required a qualified mental health professional or medical staff to conduct an initial mental health screening within 14 days of a detainee's admission to the jail. People who screened positive for mental health problems were supposed to be referred to a qualified mental health professional for further evaluation. Detainees in need of acute mental health services beyond those available at the jail were supposed to be transferred to an appropriate facility. Defendant Rutan failed to conduct or arrange for this screening and otherwise failed to follow this policy, even though he knew it was required and even though Josh was desperately in need of such a screening (at a minimum).

144.    Defendant Rutan was personally aware that Josh was locked in PAD7, acting abnormally and unable to effectively communicate. He knew that Josh could not keep his cell clean, could not stay clothed, could not bathe himself, and could not function in the general population due to his mental status. He had reason to believe that Josh had serious mental health issues because Commander Everhart told him so and because it was obvious. Despite that knowledge, he chose not to refer Josh for higher-level care where he could be properly evaluated and treated.

145.    Defendant Rutan knew that as an LPN, he was not authorized to diagnose Josh's condition or rule out any illness or disease. Yet he failed to report Josh's condition to his supervising physician, Defendant Everson, until July 28—after Josh had been locked in isolation for more than a week—and failed to perform his gatekeeping duty thereafter.

146.    Defendant Rutan had access to and was familiar with the jail's medical policies and procedures. These policies established minimal requirements for the care of individuals in the jail's custody. Defendant Rutan ignored the policies. The policy addressing "Segregated Detainees," for example, required Defendant Rutan to conduct regular checks on people held in extreme isolation, including Josh, to ensure they did not deteriorate. It required him to document those checks. And it required him to arrange for weekly checks by mental health staff. Defendant Rutan disregarded all of those requirements (and others) with respect to Josh.

147.    Defendant Rutan's actions in ignoring the severity of Josh's condition, failing to elevate his care to a higher level, and failing to follow jail policy and perform his gatekeeping responsibilities reflected deliberate indifference to Josh's serious medical and mental health needs. They violated the standards of care for a licensed practical nurse, caused Josh to experience unnecessary pain and suffering, and caused his death, in violation of the Fourteenth Amendment to the United States Constitution.

148.    Defendant Rutan acted with intent, malice, deliberate indifference, gross negligence, and/or reckless disregard for Josh's constitutional rights.

<u>Deliberate Indifference by Defendant Ronald Everson</u>

149.    Dr. Ronald Everson was a policymaker for ACH and Jackson County with authority over jail medical policy and procedures.

150.    On July 28, 2021, Defendant Everson was informed by Nurse Rutan that Josh was confused and aggressive and could not understand what people were telling and asking him. Nurse Rutan told him that Josh sometimes made comprehensible statements, but that he didn't think Josh fully understood what he was saying. Nurse Rutan also told him that Josh was unable to sign or agree to the suicide release form.

151.    Defendant Everson was aware that Nurse Rutan was the only medical professional at the jail, that he was there only three or four days a week, and that he was an LPN with very limited medical education, training, and licensure. Despite being Nurse Rutan's only supervising medical provider, Defendant Everson provided him little-to-no supervision, training, or direction.

152.    In addition, despite his knowledge, Defendant Everson never took any steps to ensure that Josh received appropriate mental health care, including evaluation by a qualified mental health professional and necessary treatment. He never visited Josh himself or spoke with other jail staff about Josh's symptoms and presentation.

153.    Defendant Everson's actions in ignoring Josh's condition, failing to see Josh in person, failing to secure appropriate mental health care for him, and failing to properly supervise Nurse Rutan reflected deliberate indifference to Josh's serious medical and mental health needs. They violated the medical standard of care and caused Josh to endure unnecessary pain, suffering, and death, in violation of the Fourteenth Amendment to the United States Constitution. As a county policymaker, his acts and omissions are attributable to Jackson County for purposes of liability under 42 U.S.C. § 1983.

<u>The County's Failure to Adopt Reasonable Policies and Procedures to Protect People with</u>
<u>Serious Medical and Mental Health Issues</u>

154.    Acting through the Jackson County Sheriff's Office, Jackson County failed to adopt adequate policies and procedures to protect people in its jail's custody who were suffering from serious medical or mental health issues.

155.    According to Sgt. Ferguson, detainees who are placed on Medical Observation are supposed to be visually observed every 15 minutes by custody staff, and those observations are supposed to be documented. However, there does not appear to be a written policy or procedure governing Medical Observation. The unwritten policy allows staff to conduct the visual observations remotely through the use of video monitors. However, officers are responsible for monitoring up to 96 different camera views throughout the jail. The officers responsible for monitoring have other responsibilities, including opening doors, answering phones, serving meals, monitoring call boxes, and monitoring video chats. The documentation expected of people on medical watch is minimal and does not enable staff to recognize concerning patterns of behavior from one shift to the next. The County's failure to adopt and enforce a reasonable and adequate policy and procedure to govern the monitoring of detainees with serious medical or mental health concerns exposed people like Josh to known and obvious risks, in violation of the Fourteenth Amendment to the United States Constitution, and caused Josh's suffering and death.

156.    To the extent the County did have a policy or procedure governing Medical Observation, the jail's actual practice, as described in the preceding paragraph, exposed people in the jail with serious medical or mental health needs, including Josh, to known and obvious risks and was virtually certain to result in constitutional violations. The practice violated the Fourteenth Amendment to the United States Constitution and caused Josh's suffering and death.

157.    It is well known and generally accepted that solitary confinement can cause severe and long-lasting psychological harm to those who are subjected to it—especially those with pre-existing mental illness. Despite this knowledge, Jackson County failed to adopt an adequate policy or procedure to limit the use of solitary confinement in the Jackson County Jail, particularly for people with mental illness. The County's failure to adopt such a policy or procedure exposed people like Josh to known and obvious risks, in violation of the Fourteenth Amendment to the United States Constitution, and caused Josh's suffering and death.

<u>Inadequate Medical and Mental Health Staffing and Services at the Jackson County Jail</u>

158.    At all relevant times the County employed just one full-time nurse for the entire jail. That nurse—Defendant Rutan—was a licensed practical nurse (LPN), a type of nurse with less training, skills, and authority than a registered nurse (RN). His licensure limited his scope of practice to such things as gathering information, checking vital signs, passing out medication, and performing other basic tasks. But he was not allowed to diagnose medical or mental health conditions, prescribe medication, or make decisions regarding treatment. Nor was he allowed to practice independently. Nurse Rutan was typically at the jail three or four days a week. On his days off and in the evenings the jail had no medical professionals onsite to address emergencies or other medical needs. The County's decision to allow the jail to be without any onsite medical professional more than three-quarters of the time was deliberately indifferent and exposed Josh and others in its custody to a significant risk of serious harm.

159.    The County contracted with Advanced Correctional Healthcare, Inc. (ACH), a private correctional healthcare provider, to provide certain additional medical services, as described elsewhere in this complaint.

160.    The jail's medical and mental health staffing at the time of Josh's confinement was insufficient to meet the serious health needs of the people in its custody. Defendants Meyer and Everhart were aware of this deficiency and allowed it to persist despite knowing that it exposed the men and women in the jail's custody to a substantial risk of serious harm. This practice caused Josh's damages by depriving him of the professional medical and mental health assessments he needed to diagnose and treat his serious conditions.

161.    Neither Nurse Rutan nor Dr. Everson had specialized expertise in mental health.

162.    Indiana law requires county jails to arrange for 24-hour emergency psychological care according to a written plan that includes arrangements for the use of appropriate health facilities. *See* 210 IAC 3-1-11(i). In June 2021, the Indiana Department of Corrections inspected the Jackson County Jail and found it was non-compliant with this rule. It had no contracts or written plans to provide emergency mental health services when needed. Defendants had been aware of this deficiency at least since June 2019. However, it continued unremedied through Josh's confinement, resulting in him receiving no psychological care, which, in turn, resulted in his decompensation and eventual death.

163.    The jail population in Indiana and elsewhere includes significant numbers of people with serious mental illness. The County's knowing failure to comply with Indiana law requiring written plans and arrangements for emergency mental health services, and its failure to provide sufficient staffing to adequately address the mental health needs of people in its custody, caused Josh's suffering and death.

County's Failure to Adequately Train Staff

164.    Jackson County failed to adequately train and supervise its jail staff in how to safely and humanely manage people with severe mental illness without resorting to the use of

unreasonable force and restraint. It was highly predictable that such a failure would lead to unconstitutional mistreatment of people in the jail's custody suffering from serious mental illness, in violation of the Fourteenth Amendment to the United States Constitution. This failure caused Josh's suffering and death.

165.  Jackson County failed to adequately train and supervise its jail staff in how to recognize and properly respond to serious medical and mental health problems requiring urgent and/or additional care beyond what was available at the jail. It was highly predictable that such a failure would lead to unconstitutional mistreatment of people in the jail's custody suffering from serious medial or mental illness and result in unnecessary suffering and death, in violation of the Fourteenth Amendment to the United States Constitution. This failure caused Josh's suffering and death.

166.  Josh was not the only victim of the County's failure to adequately train and supervise jail staff to recognize and properly respond to serious medical and mental health problems. Other people confined in the jail have suffered due to staff's inability to recognize and properly respond to serious medical and mental health problems. For instance, four days before Josh was brought to the Jackson County Jail, another jail detainee, Ta'Neasha Chappell, died when staff failed to recognize and properly respond to severe symptoms she exhibited.

County's Unconstitutional Customs and Practices

167.  The unconstitutional conduct described in this complaint was carried out in accordance with the Jackson County Jail's official policies and/or longstanding customs and practices.

168.  At the time of Josh's confinement, Jackson County Jail staff regularly delayed or failed to complete the medical and mental health screenings and assessments required by its written

policies and Indiana law. These screenings and assessments, which were required to be performed as part of the standard booking procedures and within 14 days after someone was booked into the jail, were essential to identify detainees' medical and mental health needs, to track changes in symptoms, and to ensure that people with serious medical or mental health conditions received necessary care. Defendants Meyer and Everhart were aware that staff regularly delayed or failed to complete these required screenings and assessments. They acquiesced in the practice despite knowing that such delays and failures subjected the men and women it the jail's custody to a substantial risk of serious harm. This practice caused Josh's damages by failing to identify his serious mental health needs early during his confinement, preventing him for receiving prompt and necessary treatment that would have saved his life.

169.    At the time of Josh's confinement, Jackson County Jail staff had a practice of making decisions regarding the medical and mental health needs of people in the jail, rather than referring those people to licensed and qualified medical professionals for evaluation. Defendants Meyer and Everhart were aware of this practice and acquiesced in it despite knowing that it exposed the men and women in the jail's custody to a substantial risk of serious harm. This practice caused Josh's damages by depriving him of the professional medical and mental health assessments he needed to diagnose and treat his serious conditions.

170.    At the time of Josh's confinement, Jackson County had a practice of regularly denying people in jail custody needed mental health care by depriving them of access to qualified mental health professionals capable of evaluating them, diagnosing mental health conditions, and providing appropriate treatment. Defendants Meyer and Everhart were aware of this practice and acquiesced in it despite knowing that it exposed the men and women in the jail's custody to a

substantial risk of serious harm. This practice caused Josh's damages by depriving him of the professional mental health assessment, diagnosis, and treatment he needed.

171.    At the time of Josh's confinement, Jackson County Jail staff had a practice of failing to document and communicate important information and observations pertaining to detainees' medical and mental health conditions. Defendants Meyer and Everhart were aware of this practice and acquiesced in it despite knowing that it exposed the men and women in the jail's custody to a substantial risk of serious harm. This practice caused Josh's damages by preventing qualified professionals from receiving critical information observed by staff, such as Josh's failure to consume sufficient fluids and nutrition and his chronic sleeplessness.

172.    Josh was not the only victim of the County's dangerous customs and practices. Four days before Josh was brought to the Jackson County Jail, another jail detainee, Ta'Neasha Chappell, died as a result of the same practices. Plaintiff alleges upon information and belief that other people confined in the Jackson County Jail have suffered due to the dangerous practices described in this complaint.

ACH's Unconstitutional Customs and Practices, Failures to Train, and Decisions by Policymaker

173.    Defendant Everson was an ACH policymaker with authority over the healthcare policies and ACH operations at the Jackson County Jail and other jails where ACH operated. His actions and omissions are directly attributable to ACH for purposes of ACH's Section 1983 liability. In addition, ACH is liable for its own unconstitutional acts and omissions as described below.

174.    ACH had a practice of contracting to provide medical and mental health services at local jails and then failing to provide those services in a manner sufficient to meet minimum constitutional requirements. For example, under its contract with Jackson County, ACH was

required to have a physician or mid-level practitioner make weekly visits to the jail and stay as long as necessary to provide all necessary patient evaluations and care and to complete all other work. Its actual practice, however, was to disregard this obligation, leaving the jail dangerously understaffed and ill-equipped to meet its constitutional obligations to people with serious medical and mental health needs. Indeed, neither an ACH physician nor mid-level practitioner is believed to have visited the jail during the entire three weeks Josh was there. No ACH practitioner visited Josh despite the fact that he was clearly in need of medical and mental health services far above what the jail was capable of providing.

175.    ACH was also responsible for overseeing the jail's healthcare services to ensure that they met constitutional minimums. This included an obligation to conduct Continuous Quality Improvement (CQI) activities centered around collecting data about the jail's healthcare performance, reviewing reports about the jail's healthcare program and the general health of jail detainees, and generally assuring that the systems, policies, and practices of the jail were adequate to meet the serious healthcare needs of the jail's population. CQI is essential to recognizing healthcare shortcomings and failures within a jail and making necessary improvements to avoid subjecting patients to an unreasonable risk of harm. ACH's CQI program was supposedly designed to identify healthcare problems at the jail, implement corrective action plans when necessary, and assure that the jail's healthcare operations were constitutionally adequate.

176.    ACH's CQI program was supposed to include the participation of ACH personnel in the review and analysis of monthly data, with the goal of identifying areas of deficiency and implementing improvements where needed. Among other things, the program required the collection of data on initial medical screenings, mental health services, off-site services, primary care, and a host of other medical and mental health services. It required ACH and county personnel

44

to meet at least three times a year to formally discuss CQI issues. It required that ACH conduct peer reviews of the county nurse at least twice per year. It required the review of statistical data relative to patient care. And it required various other steps, as well as specific procedures and timelines, to ensure that the jail's overall healthcare operations were sound.

177.     But despite ACH's obligations and the County's reliance on ACH to assure that its jail met constitutional standards, ACH largely disregarded the CQI program. Indeed, for at least one year leading up to Josh's confinement, the required quarterly meetings and reviews did not occur. ACH did not collect and analyze data as required. In fact, for at least seven months leading up to Josh's confinement, none of the required data was collected at all—let alone monthly as required. Peer reviews of Nurse Rutan were not occurring and had not occurred for several years— let alone twice per year as required. And various other aspects of the program were regularly ignored by ACH. ACH did not consistently assess the clinical performance of the jail or develop the required strategic plan for patient care. It did not review adverse events (including deaths) and near-miss clinical events so that deficiencies in care could be identified and rectified. Although ACH's Continuous Quality Improvement Program looked good on paper, the company did not follow it.

178.     ACH's failure to comply with its oversight obligations, including the CQI program, enabled the ongoing systemic deficiencies described elsewhere in this complaint to persist, subjecting Joshua McLemore and other jail detainees to substantial risks of serious harm. Such deficiencies include (1) inadequate medical and mental health staffing, (2) failures to adequately train jail staff, and (3) the persistent and widespread unconstitutional practices as detailed in above. It was ACH's obligation to identify and correct those problems, but it failed to do so, resulting in the unreasonable backlog in intake screenings and 14-day health appraisals, staff's failure to follow

45

written requirements to protect people in extreme isolation from harm, the jail's failure to protect people with mental illness from the serious risks associated with prolonged solitary confinement, staff's failure to identify people who were unfit for confinement due to their medical or mental health needs, staff's failure to refer patients with serious medical or mental health needs to higher-level healthcare providers, staff's failure to adequately monitor patients with acute medical or mental health needs, staff's failure to properly document critical observations pertaining to patients' conditions, and staff's failure to recognize when patients needed urgent or emergent care and their failure to arrange for that care.

179.    ACH's conduct was deliberately indifferent. It acted with reckless disregard of Josh's constitutional rights and the rights of others confined at the jail. The conduct alleged against ACH was a moving force in causing Josh to experience unnecessary pain and suffering and, ultimately, an avoidable death.

## V.    CAUSE OF ACTION

**42 U.S.C. § 1983: Violations of the Fourteenth Amendment to the United States Constitution**

180.    Based on the allegations in this complaint, all Defendants are liable under 42 U.S.C. § 1983 for violating Joshua McLemore's rights under the Fourteenth Amendment to the United States Constitution, causing him unnecessary pain and suffering and, ultimately, an avoidable death.

## VI.    JURY DEMAND

Plaintiff demands a trial by jury.

## VII.    REQUEST FOR RELIEF

Plaintiff asks the Court to award the following relief:

A.      All available compensatory damages, including damages for Joshua McLemore's mental, physical, and emotional pain and suffering, the loss of the value of his life, and all other compensatory damages available under federal law;

B.      Punitive damages against Defendants Meyer, Everhart, Ferguson, Rutan, Everson, and Advanced Correctional Healthcare, Inc.;

C.      Attorneys' fees and litigation costs; and

D.      Any other relief that the Court deems just and equitable.

DATED this 12th day of April, 2023.

<div style="margin-left: 50%;">

**BUDGE & HEIPT, PLLC**
808 E. Roy St.
Seattle, WA 98102


  s/ *Hank Balso*n
Edwin S. Budge
Hank Balson
Erik J. Heipt
ed@budgeandheipt.com
hank@budgeandheipt.com
erik@budgeandheipt.com
(206) 624-3060
Attorneys for Plaintiff

</div>